IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MUSSARAT RUFI SYED,          :

               **Plaintiff**          :          **CIVIL NO. 1:10-CV-02177**

                 **v.**          :

YWCA OF HANOVER,          :

             **Defendant**          :          **Judge Sylvia H. Rambo**

# M E M O R A N D U M

    In this civil rights action, Plaintiff alleges that Defendant, her former employer, unlawfully discriminated against her based on her race, national origin, and religion in violation of Title VII of the Civil Rights Act ("Title VII"),[1] Section 1981[2] (Count I), and the Pennsylvania Human Relations Act ("PHRA")[3] (Count III). Additionally, Plaintiff asserts a pendent Pennsylvania common law tort claim for intentional infliction of emotional distress (Count II). Before the court is Defendant's Motion for Partial Summary Judgment (Doc. 27) on Plaintiff's claims

---

[1] As amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII").

[2] 42 U.S.C. § 1981. Plaintiff asserts both her Title VII claim and Section 1981 at Count I, which she entitles "Discrimination and Harassment based upon Race/National Origin and Religion in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S. C. Section 2000e, *et seq.*, as amended by the Civil Rights Act of 1991, 42 U.S.C. Section 1981; and the Civil Rights Act of 1866, 42 U.S.C. Section 1981." For purposes of this motion, Plaintiff's claims under Title VII and Section 1981 will be addressed concurrently. *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 267 (3d Cir. 2010) (in the Third Circuit, courts generally apply "the tests used to evaluate employment discrimination claims brought under Title VII . . . to employment discrimination claims brought under § 1981, since 'the substantive elements of a claim under section 1981 are generally identical to the elements of an employment discrimination claim under Title VII.'") (citations omitted).

[3] 43 P.S. §§ 951 *et seq.* Section 955 of the Pennsylvania Human Relations Act makes it an unlawful discriminatory practice for an employer to discriminate on the basis of race, religion, or national origin. 43 P.S. § 955(a).

under Title VII and the PHRA, constructive discharge,[4] and intentional infliction of emotional distress.  Defendant does not seek summary judgment on Plaintiff's claim for retaliation under the PHRA.  For the reasons set forth below, Defendant's motion will be granted only with respect to Plaintiff's claim for intentional infliction of emotional distress.

## I.        Background[5]

### A.    Parties

Plaintiff, Mussarat Rufi Syed ("Syed"), is an Asian-Pakistani female who was born in Pakistan and identifies as a Muslim and a practitioner of Islam. (Syed Dep. at 62; Doc. 29, ¶ 1.)  Syed received several degrees in the field of education from institutions in Pakistan prior to immigrating to the United States, and was enrolled in the TEACH program, an employer-sponsored continuing education program, while employed by YWCA.  (*See* Syed Dep. at 29-33; Doc. 33, ¶ 4.) Defendant, YWCA of Hanover ("YWCA"), is a non-profit corporation that provides services to the Hanover community and, during Syed's employment, had employed over thirty-five employees.  (Def.'s Ans. ¶ 8; Heffner Dep. at 35.)

---

[4] Although "constructive discharge" is not set forth in a separate cause of action, both parties have fully briefed the issue, and the court will interpret a claim for constructive discharge from the complaint as pled.

[5] In considering the instant motion, the court relied on the uncontested facts or, if the facts were disputed, viewed the facts and deduced all reasonable inferences therefrom in the light most favorable to Plaintiff as nonmoving party. *See Doe v. C.A.R.S. Prot. Plus*, 527 F.3d 358, 362 (3d Cir. 2008) (on motion for summary judgment, evidentiary materials of record must be viewed in the light most favorable to the nonmoving party).

B. __Facts__

Syed was employed by YWCA from November, 1999 until she resigned from her position on March 10, 2010. (Syed Dep. at 43-44; Doc. 29, ¶¶ 1, 3.) At the time she ended her employment with YWCA, Syed was a Group Supervisor for the three-to-four-year-old age group class, a position to which she was promoted in 2000. (Syed Dep. at 45; Doc. 29, ¶ 2; Doc. 33, ¶10.) As a Group Supervisor, Syed was considered the "lead teacher" in her classroom (Syed Dep. at 45), and had two Assistant Group Supervisors under her direction, including Donna Galemore ("Galemore") and Tina Raffensberger ("Raffensberger"), both of whom are Caucasian females. (Syed Dep. at 43-44, 93.) At the time pertinent to the instant matter, the relevant "chain of command"[6] at the YWCA, as indicated in the YWCA Personnel Policies and Procedures dated August 8, 2007, in descending order of authority, was as follows: (1) Executive Director; (2) Child Care Director; (3) Assistant Child Care Director; (4) Group Supervisor; and (5) Assistant Group Supervisor. (*See* Doc. 34, Ex. I, sec. 11:01-"Organizational Chart"; *see also* Doc. 34-13, at P-5.) Syed's immediate supervisor was the Assistant Child Care Director, Heidi Durst ("Durst"), who in turn was supervised by the Child Care Director, Sherri Straub ("Straub"), who was supervised by Executive Director, Tina Heffner ("Heffner"). (Syed Dep. at 38-40, 47, 51-56; *see* Doc. 34, Ex. I, sec. 11:01.)

---

[6] Although in its Statement of Undisputed Material Facts (Doc. 29, ¶5) YWCA submits that "As Assistant Child Care Director, Ms. Durst performed a range of duties, however, she did not [have] supervisory authority over Plaintiff," a Record of Disciplinary Action, dated October 13, 2009, which was authored by Heffner, clearly states that "I [(Heffner)] explained that Ms. Staub *and Ms. Durst* are [Syed's] direct supervisors and that when they request she do something – it is [Syed's] responsibility to carry out their request." (Doc. 34-13, at P-5) (emphasis supplied). Therefore, for purposes of the motion, *sub judice*, the court will treat Durst as Syed's supervisor.

Syed did not discuss her religious beliefs with other YWCA employees, but she believed people knew she was Muslim.  (*See* Syed Dep. at 81, 83.)  In November, 2008, Syed approached Durst with a request to take a day off to celebrate *Eid*, a religious Islamic holiday.  (*Id*. at 62-63, 71.)  Syed was aware that YWCA's policies required submitting a formal written request for time off; however, she orally requested time off because she wanted to get preliminary approval from Durst, which was a typical practice for employees.  (*See id*. at 63-73.)  Durst denied Syed's oral request.  (*Id*. at 73-75.)  Syed admitted that, at the time of her request, she had already requested several days off at the end of the year.  (*Id*.) However, the explanation given by Durst as to the reason for her denying Syed's request was that Durst knew "only one holiday . . . Christmas."  (*Id*. at 73.)  Durst denies ever making this statement.  (Durst Dep. at 103.)

On another occasion, Syed requested time off in order to attend a "religious convention" in Virginia.  (Syed Dep. at 86.)  Syed did not indicate the religious nature on the leave request form.  (*Id*. at 88.)  Syed was informed that her request was denied because two individuals had previously requested that day off.  (*Id*. at 88-91.)  However, Syed later discovered that two different individuals who were not granted time off prior to Syed's request were permitted to leave work early that day.  (*Id*.)

In 2009, Syed requested permission to organize a Christmas party for the children in her class.  (*Id*. at 93.)  Straub denied Syed's request and, without Syed's knowledge, gave permission to her subordinates, Raffensberger and Galemore, to organize a Christmas party.  (*Id*. at 93-94.)  Syed characterized the

4

incident as an instance of differential treatment and attributed the denial of her request to her being a Muslim.  (*See id*. at 100.)

Syed believed that she was being targeted for harassment by her supervisors and by Assistant Group Supervisors Galemore and Raffensberger at the direction of her supervisors.  Syed testified that Galemore and Raffensberger would "spy" on her (Syed Dep. at 126); that she was prohibited from using the elevator with her class, despite other Group Supervisors being allowed to use the elevators (*Id*. at 124); that, despite her seniority, she was forced to do the menial tasks in the classrooms, such as cleaning bodily fluids (*see id*. at 103-06, 244-48); that, on at least one occasion, a "spot check" was performed upon her personal belongings without her consent (*Id*. at 251; Durst Dep. at 125-32); that she was told not to speak with parents because "no one could understand her due to her accent" (Syed Dep. at 136-39); and that the sign to her classroom was altered to have her name listed on the bottom, despite her seniority over the Assistant Group Supervisors who were listed above her (*Id*. at 254-55).

Syed attributed the hostility and differential treatment she experienced at YWCA to her being the only employee who was non-Caucasian or Muslim, noting that she was the only person treated in such a manner.  (*Id*. at 115; *see also* Doc. 34-13 at Ex. I, P-10.)  On one occasion when Syed was discussing her perceptions of harassment with Heffner, Heffner held up a religious cross necklace she wore around her neck and said, "[m]y cross will help me."  (Syed Dep. at 116.)  Heffner denies that this event ever occurred.  (Heffner Dep. at 352.)

In her deposition, Syed further testified that Durst told her not to wear a Pakistani *Shalwar Kameez*, a certain traditional ethnic dress, to an employee

Christmas party in January, 2009.  (Syed Dep. at 156.)  According to Syed, Durst explained that she thought the dress was "awful" and that "[Syed looked] weird in [her] Pakistani dress."  (*Id*. at 154-55.)  Durst denies ever making this derogatory statement.  (Durst Dep. at 121-23.)[7]

On February 8, 2009, Syed authored an email to Straub in which she raised complaints of "harassment" and "discrimination" arising out of the actions of Durst.  (Doc. 29, ¶¶13-14; Doc. 34-13 at Ex. I, P-6.)  The email contained allegations that Durst treated Syed differently than other teachers.  (Doc. 34-13 at Ex. I, P-6.)  The email did not indicate that Syed believed the differential treatment was racially, religiously, or ethnically motivated.  (Doc. 29, ¶15; Doc. 34-13 at Ex. I, P-6.)

On March 16, 2009, Syed received an unexcused absence for failing to attend a mandatory child care staff meeting and was charged three hours of vacation time, despite Syed submitting a signed letter authored by her tutor verifying that

---

[7]At her deposition, Durst had an opposite recollection of her conversation with Syed regarding Syed's *Shalwar Kameez*:

Q:    What did you say to Mrs. Syed about her attire?

A:    She was - - she said about wearing her . . . native clothing - - to the Christmas party.  She was reluctant and I told her [that] her native attire was beautiful.

\*        \*        \*

Q:    Did you say anything critical of her attire?

A:    No.

Q:    Did you tell her that her outfit, meaning her native clothing as you described it, looked weird?

A:    No.

Q:    Did you ever belittle her clothing in any way?

A:    No.

(Durst Dep. at 121-23.)

Syed was being tutored during that time as part of her continuing education.  (Doc. 34-13 at Ex. I, P-7, P-8.)  Heffner's handwritten notes[8] on the letter (*see* Heffner Dep. at 283-84) indicated a perceived "conflict" between the original reason for Syed's absence from the meeting and the reason as indicated by the tutor's letter (Doc. 34-13 at Ex. I, P-7; *see* Heffner Dep. at 284).

In April, 2009, YWCA informed Syed that a complaint had been lodged against her by a parent regarding Syed's alleged use of force upon a child that resulted in bruising to the child's arm.  (*See* Syed Dep. at 193-200.)  Syed was further informed that YWCA would investigate the allegations, and she was instructed not to confront any parent regarding the incident subject to the investigation.  (Syed Dep. at 197-98.)  Despite this instruction, Syed confronted the parent, and, as a result, received a verbal warning, memorialized in an Employee Conversation Record dated April 8, 2009.  (Doc. 34-13 at Ex. I, P-9.)  On April 9, 2009, Syed authored a formal memorandum to Heffner and Straub in response, which addressed the April 8, 2009 incident, as well as management's "fail[ure] to address th[e] issue" raised in her February 8, 2009 email.  (Doc. 34-13 at Ex. I, P-10.)  On April 15, 2009, Syed authored another memorandum to Heffner and Straub, which indicated, *inter alia*, that "whenever [Durst] comes to [Syed's] room and

---

[8] The handwriting on the note provided as follows:

Let it be noted that [Syed] informed me [(Heffner)], she was not in attendance @ staff meeting due to her mother being in hospital. There was no mention that she was at the library.

(Staff meetings are mandatory, unless excused. She was <u>not</u> excused from staff meeting on 3/10/09).

(Doc. 34-13 at Ex. I, P-7).

[Syed] is alone, [Durst] makes inappropriate, racial remarks concerning [Syed's] ethnicity," and acknowledged that "[she (Syed)] is the only person at the YWCA who is not a Caucasian, [or a] native of this country" and that "[her] oral complaints of bigotry and mistreatment fall on deaf ears." (*Id*.)

According to Syed, there were several occasions where her national origin was referenced in a blatantly derogatory manner. For example, in March, 2009, Syed went to Straub's office to ask a question. (Syed Dep. at 149-50.) Syed knocked on the half-opened door to Straub's office while simultaneously pushing the door fully open. (*Id*.) In response, Straub directed Syed out of her office and said "I know that . . . in Pakistan you don't know . . . how . . . you enter the room." (*Id*.) In another instance, in October, 2009, Durst directed Syed, along with several other of the more senior employees, to go home early, pursuant to directions from Heffner. (*See* Doc. 34-13 at P-5.) Syed, who did not drive, stated that she would have to see if she could find a ride home, to which Durst "screamed" at her and said, "[Y]ou need to learn how to drive. This is not your Pakistan and we are not riding camel[s] here." (Syed Dep. at 172.) Durst reported to Heffner the interaction between herself and Syed as an instance of insubordination. (*See* Doc. 34-13 at Ex. I, P-5.) Durst did not report her own allegedly discriminatory remark. (*Id*.) The following day, Heffner requested a meeting with Syed to discuss the incident at which time Syed requested to bring someone as a witness that was "of her native language." (*Id*.) The request was denied by Heffner to the extent that Syed was only permitted to bring someone from within the organization. (*See id*.) In response, Syed stated that a person from within YWCA would not be neutral because "everyone is 'white.'" (*Id*.) Heffner characterized this comment as a "racial slur," and issued a written disciplinary

warning to Syed on the basis that such a statement was against YWCA policies and goals.  (*See id.*)  The written warning concluded by restating the "at-will" nature of the relationship between Syed and YWCA, and threatened that, if the relationship between Syed and YWCA did not improve, YWCA would "terminate the relationship."  (*Id.*)

      At her deposition, Syed further testified that Durst, her immediate supervisor, called her a "brown bitch" on at least two occasions in 2009.  (Syed Dep. at 256-57.)  Durst denies ever referring to Syed in this manner.  (Durst Dep. at 111.)

      On February 8, 2010, Syed authored another email to Heffner, in which she again communicated her claims that she was suffering harassment and discrimination from her coworkers and again requested Heffner take action to stop the "daily abuse and torment."  (Doc. 34-13 at Ex. I, P-14.)  In February, 2010, Heffner, acting in her capacity as Executive Director, observed Syed's classroom. Based upon her observations, Heffner met with Syed, Galemore, and Raffensberger and informed the three teachers of her concern that the classroom was "out of order" and that they had "thirty (30) days to 'pull together' their classroom environment." (Doc. 34-13 at Ex. I, P-19.)   According to Heffner, during this conversation, Syed became "argumentative, . . . disrespectful[,] and insubordinate," and shifted the focus of the conversation from Heffner's critiques to extraneous issues.  (Doc. 34-13 at Ex. I, P-19.)  Heffner characterized Syed's actions during the meeting as "negative behavior, unsatisfactory and disrespectful conduct," and another instance of "repeated acts of insubordination."  (*Id.*)  Heffner subsequently issued a final written warning to Syed, and placed her on a period of unpaid suspension for three days to

commence at 10:30 a.m., February 26, 2010, and end on Thursday, March 4, 2010. (Doc. 34-13 at Ex. I, P-19, P-18.)

Following her suspension, Syed suffered from an illness secondary to stress and depression, and was advised by her physician not to go into work that Thursday (March 4, 2010) and Friday (March 5, 2010). (Doc. 34-13 at Ex. I, P-20.) On Monday, March 8, 2010, Syed did not come into work, but arrived to the facilities after hours. (*see* Doc. 34-13 at Ex. I, P-21.) While at the YWCA, Syed removed lesson plans from a filing cabinet in her classroom, at which point she was confronted by Heffner. (Syed Dep. at 252; *see* Doc. 34-13 at Ex. I, P-21). Syed testified that during this encounter, Heffner "pushed" her and looked into her personal handbag. (Syed Dep. at 252-53.) On March 9, 2012, Syed neither "show[ed] up for work" nor "phone[d] in an absence." (Doc. 34-13 at Ex. I, P-21.) On March 10, 2010, Syed submitted a letter of resignation terminating her employment with YWCA. (Doc. 34-13 at Ex. I, P-22.) Syed cited the "discrimination, harassment, and insults [made] by [her] co-workers and supervisors alike" as the basis for her resignation. (*Id.*)

## C.   **Procedural History**

Following her receipt of a Notice of Right To Sue from the United States Equal Employment Opportunity Commission on July 26, 2010, Syed initiated this action by filing a complaint on October 22, 2010. (Doc. 1.) YWCA filed its answer on December 16, 2010. (Doc. 6.) Following an extended discovery period, Defendant filed a motion for partial summary judgment on May 21, 2012 (Doc. 27), accompanied by a statement of material facts (Doc. 29) and brief in support (Doc. 28). Plaintiff filed a response (Doc. 31), brief in opposition to Defendant's motion

(Doc. 32), and counter-statement of material facts (Doc. 33) on June 11, 2012, and exhibits in support of her opposition on June 12, 2012 (Doc. 34). Defendant filed a reply answering Plaintiff's counter-statement of material facts on June 25, 2012. (Doc. 35.) Thus, Defendant's motion is now ripe for disposition.

## II.        Legal Standard

In an employment discrimination case, the burden of persuasion on summary judgment remains "unalterably with the employer as movant." *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 362 (3d Cir. 2008). The employer must "persuade [the court] that even if all of the inferences which could reasonably be drawn from the evidentiary materials of record were viewed in the light most favorable to the plaintiff, no reasonable jury could find in the plaintiff's favor." *Id.* Summary judgment is proper when the record, taken in its entirety, shows that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a);[9] *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable factfinder to return a verdict for the nonmoving party. *Id.* When evaluating a motion for summary judgment, a court "must view the facts in the light most favorable to the non-moving party," and draw

---

[9] Rule 56 was revised in 2010. The standard previously set forth in subsection (c) is now codified at subsection (a). The language of this subsection remained unchanged, except that genuine "issue" became genuine "dispute." Fed. R. Civ. P. 56 advisory committee's note, 2010 amend. As the standard set forth for summary judgment remains unchanged by the 2010 amendments, application of the Rule in cases that predate the 2010 revisions of the rule are guiding.

all reasonable inferences in favor of the same. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005); *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). "Once the moving party points to evidence demonstrating no issue of material fact exists, the nonmoving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." *Azur v. Chase Bank, USA*, 601 F.3d 212, 216 (3d Cir. 2010). The non-movant's burden in defending against summary judgment in a Title VII case is no different than any other case, as the nonmoving party may not simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotations omitted); *see also Saldana*, 260 F.3d at 231-32 (citations omitted). Summary judgment should be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *accord Ullrich v. U.S. Sec'y of Veterans Affairs*, 457 F. App'x 132 (3d Cir. 2012). If the nonmoving party's evidence "is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992) (quoting *Anderson*, 477 U.S. at 249-50). However, "[s]uch affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a

scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of W. Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

A court may not consider the credibility or weight of the evidence in deciding a motion for summary judgment, even if the quantity of the moving party's evidence far outweighs that of its opponent. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). Rather, it remains the "province of the factfinder to ascertain the believability and weight of the evidence." *Id.* For purposes of considering a motion for summary judgment, the court "should not consider the record solely in piecemeal fashion, giving credence to innocent explanations for individual strands of evidence, [because] a jury . . . would be entitled to view the evidence as a whole." *Abramson*, 260 F.3d at 285 (citing *Howley v. Town of Stratford*, 217 F.3d 141, 151 (2d Cir. 2000)). Relevant to the matter *sub judice*, the Third Circuit has noted, "Title VII does not have a corroboration requirement" and, therefore, the granting of summary judgment in a Title VII case cannot turn on a credibility determination because such determinations are for the finder of fact. *Durham Life Ins. v. Evans*, 166 F.3d 139, 147 (3d Cir. 1999).

## III.      Discussion

### A.      Title VII and PHRA Claims

Title VII of the Civil Rights Act and the Pennsylvania Human Relations Act prohibit discrimination in employment based on race or national origin. The PHRA is construed consistently with interpretations of Title VII. *See Ildefonso v. City of Bethlehem*, 2012 U.S. Dist. LEXIS 96568, n.5 (E.D. Pa. July 12, 2012)

(citing *Wilkerson v. New Media Tech. Charter Sch., Inc.*, 522 F.3d 315, 318-19 (3d Cir. 2008)); *see also Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002); *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1995) ("[w]hile the Pennsylvania courts are not bound in their interpretations of Pennsylvania law by federal interpretations of parallel provisions in Title VII . . . [Pennsylvania] courts nevertheless generally interpret the PHRA in accord with its federal counterparts." (citations omitted)); *Smith v. Pathmark Stores*, 1998 U.S. Dist. LEXIS 8631, *8 (E.D. Pa. June 11, 1998) ("courts have uniformly interpreted the PHRA consistent with Title VII" (citations omitted)).

Under Title VII, 42 U.S.C. § 2000e-2(a), the cognizability of a discrimination claim founded upon a hostile work environment is well-established. *See, e.g., Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (sex); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) (same); *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005) (race); *Tarr v. FedEx Ground*, 398 F. App'x 815, 819 (3d Cir. 2010) (national origin); *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 276-77, n.5 (3d Cir. 2001) (religion).  The United States Supreme Court has explained that "[w]hen a workplace is so permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [a] victim's employment and create an abusive working environment, Title VII is violated."  *Oncale v. Sundowner Offshore Srvs., Inc.*, 523 U.S. 75, 78 (1998).  To establish the existence of an actionable hostile work environment claim under Title VII, a plaintiff must prove: (1) that she suffered intentional discrimination because of her membership in a protected class; (2) that the discrimination was severe or pervasive; (3) that the discrimination detrimentally affected her ("subjective

effect"); (4) that the discrimination would detrimentally affect a reasonable person of the same protected class in that position ("objective effect"); and (5) the existence of respondeat superior liability. *Huston v. Proctor & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009); *see also Exantus v. Harbor Bar & Brasserie Rest.*, 386 F. App'x 352, 354 (3d Cir. 2010); *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 293 (3d Cir. 1999) (citing *Andrews v. City of Phila.*, 895 F.2d 1469 (3d Cir. 1990)); *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996). The Third Circuit has cautioned that a court's hostile work environment analysis "must concentrate not on individual incidents, but on the overall scenario" because it is often difficult to determine the motivation behind allegedly discriminatory actions. *Beaubrun v. Inter Cultural Family*, 2007 U.S. Dist. LEXIS 4075, *14-15 (E.D. Pa. Jan. 17, 2007). The workplace conduct is not measured in isolation. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001). Rather, "whether an environment is sufficiently hostile or abusive" must be determined "by looking at all the circumstances." *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998)). The court will analyze each element of a Title VII and PHRA claim in turn.

### 1. __Intentional Discrimination__

Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discrimination. "Verbal and physical harassment, no matter how unpleasant and ill-willed, is simply not prohibited by Title VII if not motivated by the plaintiff's [membership in a protected group]." *Koschoff v. Henderson*, 109 F. Supp. 2d 332, 346 (E.D. Pa. 2000) (citing *Oncale*, 523 U.S. at 80); *see also Lacy v. Nat'l R.R. Passenger Corp.*, 254 F. App'x 934, 938 (3d Cir. 2007).

YWCA argues that Syed has not sufficiently shown intentional discrimination.  The court disagrees, and, in viewing the facts of record and all reasonable inferences derivable therefrom in the light most favorable to Plaintiff, the court finds that Plaintiff has produced enough evidence to create a genuine issue of material fact for a jury to resolve.  For instance, Syed submitted evidence from which a reasonable factfinder could infer that the incidents of verbal harassment were motivated by animus towards Syed's race or national origin.  Specifically, Syed testified that her supervisor (1) criticized her "awful" Pakistani-styled dress; (2) called her a "brown bitch" on more than one occasion; (3) insinuated that she did not know how to properly open a door due to her national origin; and (4) told her that she needed to learn to drive because "we don't ride camel[s] here."  Furthermore, Syed submitted evidence that she was treated unfavorably as compared to employees who were not in the same protected class, including instances of her (1) receiving unwarranted discipline; (2) being denied requests to take off from work; (3) being prohibited from using the elevator; and (4) being the sole subject of improper investigations.  Such comments and unfavorable treatment could lead a jury to conclude that the supervisor's actions were intentional and motivated by Syed's membership in a protected group.  Accordingly, Syed has pointed to sufficient record evidence to demonstrate that genuine disputes of material fact exist as to whether she suffered intentional discrimination from YWCA employees.

## 2.  **Severe or Pervasive Discrimination**

YWCA argues that the record contains, at best, "sporadic and limited" incidents of discrimination, and therefore, Syed has failed to establish that the discriminatory conduct was severe or pervasive. (Doc. 28 at 16). For the following reasons, YWCA's argument is unpersuasive.

In order to establish a hostile work environment, the workplace must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (internal citation and quotation marks omitted) (citing *Meritor*, 477 U.S. at 65-67). To determine whether comments were severe or pervasive, the court evaluates "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance." *Whitesell v. Dobson Commc'n*, 353 F. App'x 715, 717 (3d Cir. 2009) (citing *Faragher*, 524 U.S. at 787-88). The "severity and pervasive" evaluation of a hostile work environment claim is particularly unsuited for summary judgment, because whether the harassment or discrimination is sufficiently severe or pervasive to create an abusive work environment is "quintessentially a question of fact." *Rorrer v. Cleveland Steel Container*, 712 F. Supp. 2d 422, 429 (E.D. Pa. 2010).

Here, the court does not find that the comments made by Durst, Straub, or Heffner were physically threatening. However, Syed testified at length that the comments and actions of YWCA employees, including her supervisors, made her feel extremely uncomfortable, singled out, and humiliated. In her email dated February 8, 2010, Syed complained to Heffner about the actions of her coworkers and "pray[ed]

17

and urge[d] [Heffner] to . . . stop the *daily* abuse and torment." (Doc. 34-13 at Ex. I, P-14) (emphasis supplied). In terms of the frequency of the discriminatory conduct, Syed testified to the occurrence of at least six instances of clear and overt discriminatory conduct, in addition to numerous instances of less discriminatory or ethnically-neutral but otherwise abusive conduct. However, viewing the "overall scenario," a reasonable factfinder could conclude that the seemingly racially- and ethnically-neutral abusive conduct was motivated by a discriminatory intent, thus inflating the overall frequency of the discriminatory conduct.

YWCA has submitted a significant quantity of evidence supporting its position that the conduct of which Syed complained was completely detached from any discriminatory motive, and the deposition testimony of Durst, Heffner, and Straub, refutes Syed's accusations of the more overt instances of discriminatory conduct. Such conflicting testimony demonstrates the existence of genuine disputes of clearly material facts. Moreover, a finding that the discriminatory conduct was not severe or pervasive would necessarily require the court to discredit Syed's testimony in favor of that of YWCA's other employees. In disposing of a motion for summary judgment, the court cannot weigh evidence and make a determination as to credibility, and must, in any event, resolve any ambiguities in the light most favorable to Syed. Although the testimony on behalf of YWCA contradicts that of Syed, her story is facially plausible.

When viewed in its entirety, the record contains evidence that the conduct of certain YWCA employees was severe or pervasive enough to unreasonably interfere with Syed's work performance. Syed testified that she had to "defend" herself from the frequent instances of verbal harassment and unwarranted

18

discipline, was required to do menial tasks despite her seniority, and that, due to the physical effects of such discrimination, she missed several days of work. Accordingly, a reasonable factfinder could conclude that Syed suffered severe or pervasive discrimination.

### 3. __Subjective Effect of Discrimination on Plaintiff__

Although YWCA does not move for summary judgment on the subjective effect of the conduct, the court concludes that the record contains evidence that the discrimination detrimentally affected Syed. Syed testified that she felt humiliated, suffered emotional distress, lost a significant amount of weight, sought medical assistance, and was directed by her doctor not go to work at the YWCA following her February 26, 2010 suspension because of the hostile work environment. Furthermore, Syed wrote several memoranda regarding her belief that her work environment was hostile. A reasonable factfinder could certainly conclude that the discrimination detrimentally affected Syed.

### 4. __Objective Effect of Discrimination__

The fourth requirement to establish a hostile work environment claim is that the discrimination must be such that it would have detrimentally affected a reasonable person of the same protected class as the plaintiff. *See Harris*, 510 U.S. at 21-22. The Supreme Court further explained this requirement in *Harris*: "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment . . . is beyond Title VII's purview." *Id*. at 21. The objective standard protects the employer from the "hypersensitive" employee, but still serves the goal of equal opportunity by removing the walls of discrimination that deprive a protected group member of self-respecting employment. *Hallberg v. Eat'n Park*, 1996 U.S.

Dist. LEXIS 3573, *26 (W.D. Pa. Feb. 28, 1996).  For purposes of the instant motion, the court must determine whether the record contains sufficient evidence to permit the finding that, from an objective point of view, a reasonable person in Syed's position would have been detrimentally affected by the environment she faced.  *See Spain v. Gallegos*, 26 F.3d 439, 450 (3d Cir. 1994).

YWCA does not move for summary judgment on this point. Nonetheless, the court concludes that a reasonable person in Syed's position would have been detrimentally affected by the work environment Syed experienced while employed by YWCA.  Syed's position as a Group Supervisor required frequent interaction with parents as well as co-workers.  A reasonable factfinder could conclude that the comments and actions of Durst, Straub, and Heffner, specifically those comments directed at Syed's appearance or accent, would detrimentally affect a reasonable person of the same race or national origin in Syed's position.

### 5.  **Respondeat Superior Liability**

YWCA does not argue that there is no basis for respondeat superior liability, but does contest whether Durst had supervisory authority over Syed.[10] Nevertheless, after reviewing the record, the court cannot conclude that there is no basis for respondeat superior liability as a matter of law.

While the first four elements of a Title VII claim establish the existence of a hostile work environment, the fifth element imputes liability for that environment

---

[10] It is undisputed that both Heffner, as Executive Director, and Straub, as Child Care Director, were direct supervisors of Syed.  However, YWCA argues that Durst "did not [have] supervisory authority over [Syed]." (Doc. 29, ¶ 5).  Although the record, for purpose of the matter *sub judice*, supports Syed's assertion that Durst was her direct supervisor (*see* Doc. 34-13, Ex. I at P-5), employer liability may exist even when the alleged harasser is a co-worker where "the defendant knew or should have known of the harassment and failed to take prompt remedial action." *Dowling*, 2002 U.S. Dist. LEXIS 25270 at 6-7.

to the employer.  In order to hold the employer liable for the conduct of a plaintiff's coworkers, the plaintiff must establish that the employer was aware of the problem and failed to take prompt and appropriate corrective action.  *Dowling v. Home Depot*, 2002 U.S. Dist. LEXIS 25270, *7 (E.D. Pa. Jan. 2, 2003).  Prompt remedial action has been defined as conduct "reasonably calculated to prevent further harassment." *Id.* (quoting *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 26 (3d Cir. 1997).  The United States Supreme Court has held that an employer is vicariously liable to a plaintiff for a hostile environment created by a supervisor with immediate authority over the plaintiff that results in a tangible employment action such as discharge, demotion, or undesirable reassignment.  *Faragher*, 524 U.S. at 807-08.

Even though Syed did not receive a discharge, demotion, or undesirable reassignment,[11] Syed could nevertheless establish employer liability as a result of her constructive discharge.  In *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998), the Supreme Court explained that:

> When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. . . . The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any [discriminatory] harassing behavior; and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

---

[11] In her brief in opposition, Syed contends that her "assignment of menial tasks" and "changes in her job responsibilities aimed toward eliminating her status as a full-time leader" were effectively demotions or undesirable reassignments. (Doc. 32 at 18.)  For purposes of this motion, the court need not determine whether these instances should be individually and independently treated as tangible employment actions.

The court further explained that, "[n]o affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Id.* More relevant to this matter, no affirmative defense is available if a plaintiff proves a constructive discharge that was precipitated by a supervisor's official act. *See Pa. State Police v. Sauders*, 542 U.S. 129, 140-41 (2004). As noted below, Syed's constructive discharge claim survives summary judgment. *See* Section III.B., *infra.* Moreover, Syed has produced evidence that her supervisors failed to stop and indeed contributed to her discrimination. Accordingly, the court cannot conclude that YWCA is entitled to summary judgment for lack of respondeat superior liability.

In short, Syed has presented sufficient record evidence of Title VII and PHRA violations to defeat YWCA's motion for summary judgment and the motion will therefore be denied as to these claims.

### B.    Constructive Discharge

YWCA moves for summary judgment on Syed's constructive discharge claim, arguing that the few alleged instances of discriminatory conduct do not rise to the level of conditions so intolerable that a reasonable employee would have resigned. In response, Syed contends that she suffered a constructive discharge due to "the existence of conditions so intolerable as to amount to constructive termination." (Doc. 32 at 18.)

To find constructive discharge, a court "need merely find that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Gross v. Exxon Office Sys. Co.*, 747 F.2d 885, 888 (3d Cir. 1984); *see also Sauders*, 542 U.S. at 147;

*Duffy v. Paper Magic Grp.*, 265 F.3d 163, 167 (3d Cir. 2001).  There must be "at least some relation between the occurrence of the discriminatory conduct and the employee's resignation."  *McWilliams v. W. Pa. Hosp.*, 717 F. Supp. 351, 355-56 (W.D. Pa. 1989) (finding that plaintiff could not show causation because the incidences complained of occurred three years prior to her resignation).  In *Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1161 (3d Cir. 1993), the Third Circuit Court of Appeals identified the following factors that may be indicative of constructive discharge as common to such claims: (1) threat of discharge; (2) suggesting or encouraging resignation; (3) demotion or reduction of pay or benefits; (4) involuntary transfer to a less desirable position; (5) alteration of job responsibilities; and (6) unsatisfactory job evaluations.

The court finds several of the *Clowes* factors present in the instant matter.  First, the record shows evidence of threat of discharge.  For example, in a written warning, Syed was reminded that her employment at YWCA was "at-will" and that, if the relationship between Syed and the YWCA did not improve, YWCA would terminate the relationship.  (Doc. 34-13 at Ex. I, P-5).  Second, according to Syed, on at least one occasion, her supervisor suggested she end her employment at YWCA.  Third, Syed has submitted evidence that her job responsibilities were altered, and that, although she was the Group Supervisor for the classroom, she was tasked with more menial and less desirable duties.  Furthermore, viewing the facts in the light most favorable to the nonmoving party, Syed was accused of baseless allegations, received improper and inaccurate performance reviews, was undermined in front of her co-workers and employees to whom she was superior, and was subject to unwarranted discipline.  On several occasions, Syed complained to Heffner about

the improper treatment to which she was being subjected, and such complaints were merely dismissed as "miscommunications." Based on these facts, a reasonable jury could conclude that YWCA permitted the discriminatory conditions and that the conditions were so unpleasant or difficult that a reasonable person in Syed's position would have felt compelled to resign. The court will therefore deny YWCA's motion for summary judgment as to Syed's constructive discharge claim.

### C.    **Intentional Infliction of Emotional Distress**

YWCA moves for summary judgment on Syed's claim for intentional infliction of emotional distress on the basis that Syed has not set forth sufficient evidence to demonstrate the outrageous conduct standard as required for such a claim.[12] In her brief in opposition to summary judgment, Syed responds that she has

---

[12] Although not raised in its motion (Doc. 27) as a basis for summary judgment, YWCA argues in its brief in support that Syed's claim for intentional infliction of emotional distress is preempted by the Pennsylvania Workers Compensation Act, 77 Pa. Stat. § 1, *et seq.* ("WCA"). (*See* Doc. 28, at 21). It is well-established that, under Pennsylvania law, the WCA generally provides the exclusive remedy for injuries sustained during the course of employment. *See Frazier v. Exide Techs.*, 2012 U.S. Dist. LEXIS 17726, *10 (E.D. Pa. Feb. 10, 2012). Section 481(a) of the WCA sets forth the general rule, and provides that employer liability under the WCA's provisions "shall be exclusive and in place of any and all other liability to [an employee]." The exclusivity provision is far-reaching, and may preempt common law torts "in matters arguably connected with work-related injuries." *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 160 (3d Cir. 1999) (citing *Winterberg v. Transp. Ins. Co.*, 72 F.3d 318, 322 (3d Cir. 1995)). Accordingly, the WCA may bar a claim for intentional infliction of emotional distress which arises out of an employment relationship. *See Williams v. U.S. Airways, Inc.*, 2007 U.S. Dist. LEXIS 65799, *4 (E.D. Pa. Sept. 5, 2007) (citing *Matczak v. Frankford Candy and Chocolate Co.*, 136 F.3d 933, 940 (3d Cir. 1997)).

Nevertheless, the WCA carves out a "personal animus" exception for acts "intended to injure the [employee] because of reasons personal to [her], and not directed against [her] as an [employee] or because of [her] employment relationship," 77 Pa. Stat. § 411(1), which has been interpreted as to allow claims where "the attack was motivated by personal reasons, as opposed to generalized contempt or hatred, and was sufficiently unrelated to the work situation as not to arise out of the employment relationship." *Lassiter v. Children's Hosp. of Phila.*, 2008 U.S. Dist. LEXIS 7579, *47 (E.D. Pa. Jan. 31, 2008). Courts evaluating similar claims have "routinely excluded from the exclusivity provision of the WCA intentional torts based on allegations of intentional infliction of emotional distress due to sexual or racial harassment by a fellow employee or supervisor." *Lang v. Seiko Instruments USA, Inc.*, 1997 U.S. Dist. LEXIS 167, *8-11 (E.D. Pa. Jan. 14, 1997) (citations omitted). Other courts

(continued...)

"pleaded outrageous and intentional conduct by harassment, including bigotry and other threatening behavior, belligerently ignoring complaints, failing to take any remedial action, and subsequent retaliation, and constructive termination." (Doc. 32 at 20.)

A claim for intentional infliction of emotional distress is a state tort and is thus governed by Pennsylvania substantive law. To prove such a claim, a plaintiff must establish that the defendant's conduct: (1) was intentional or reckless; (2) was extreme and outrageous; (3) actually caused the distress; and (4) caused distress that was severe. *Regan v. Twp. of Lower Merion*, 36 F. Supp. 2d 245, 251 (E.D. Pa. 1999) (citations omitted). To establish "outrageous conduct" in Pennsylvania, "it has not been enough that the defendant has acted with intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort." *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998) (quoting Restatement (Second) of Torts § 46, cmt. d (1977); *Dughen v. Fox*, 539 A.2d 858, 861 (Pa. Super. Ct. 1988)); *Field v. Phila. Elec. Co.*, 565 A.2d 1170, 1183 (Pa. Super. Ct. 1989). Instead, the conduct must be "so extreme in nature as to go beyond all possible bounds of decency such that it would be regarded as utterly intolerable to [a] civilized society." *Mulgrew v. Sears Roebuck & Co.*, 868 F.

---

(...continued)
considering the applicability of the personal animus exception have concluded that, since the question of the alleged harasser's intent is inherently fact intensive, "[w]hether [the] 'personal animus exception' applies is ultimately a question for the trier of fact." *Tate v. Main Line Hosp., Inc.*, 2005 U.S. Dist. LEXIS 1814, *79 (E.D. Pa. Feb. 8, 2005) (citing *McErlean v. Borough of Darby*, 157 F. Supp. 2d 441, 448 (E.D. Pa. 2001)). In any event, whether the claim is preempted by the WCA is an issue that need not be reached by the court in the instant matter, as the court concludes that Syed has failed to adequately support her claim for intentional infliction of emotional distress under Pennsylvania law.

Supp. 98, 103 (E.D. Pa. 1994).  The Supreme Court of Pennsylvania has stated, "it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress."  *Hoy,* 720 A.2d at 754 (quoting *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir. 1988)).

Based on the evidence before the court, no factfinder could reasonably conclude that YWCA's conduct – even resolving all inferences in favor of Syed – was "so extreme in nature as to go beyond all possible bounds of decency such that it would be regarded as utterly intolerable to [a] civilized society." *Mulgrew*, 868 F. Supp. at 103.  The few instances of conduct that were overtly motivated by Syed's race or national origin were not sufficiently outrageous.  Even assuming, *arguendo*, that all of the conduct complained of was intentional and discriminatory, mere callousness or insensitivity on the part of the defendant does not suffice to establish liability.  *See McFadden v. Burton*, 645 F. Supp. 457, 463 (E.D. Pa. 1986).  Such a determination is in accordance with the decisions of other courts in similar cases.[13]

---

[13] *See Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir. 1988) (noting that it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to allow recovery for intentional infliction of emotional distress); *see also James v. Int'l Bus. Mach. Corp.*, 737 F. Supp. 1420, 1428 (E.D. Pa. 1990) (employee failed to demonstrate extreme and outrageous conduct where she alleged being the target of relentless joking and harassment over a period of two years, was called a derogatory name on two occasions, and was berated by two managers an unspecified number of times); *Sharon Steel Corp. v. VJR Co.*, 604 F. Supp. 420, 422 (W.D. Pa. 1985) (allegation that company forced employee to quit his job and take early retirement was insufficient to state claim for intentional infliction of emotional distress); *Madreperla v. Williard Co.*, 606 F. Supp. 874, 880 (E.D. Pa. 1985) (employer's premeditated plan to force an employee to resign by making the employment conditions difficult typically does not amount to extreme or outrageous conduct sufficient to sustain a cause of action for intentional infliction of emotional distress); *but see Hoy*, 720 A.2d at 754 (citing *Papieves v. Lawrence*, 263 A.2d 118 (Pa. 1970) (defendant, after striking and killing plaintiff's son with automobile, and after failing to notify authorities or seek medical assistance, bury body in a field where discovered two months later and returned to parents); *Banyas v. Lower Bucks Hosp.*, 437 A.2d 1236 (Pa. Super. Ct. 1981) (defendants intentionally fabricated records to suggest that plaintiff had

(continued...)

Accordingly, the court will grant YWCA's motion for summary judgment as to Syed's claim for intentional infliction of emotional distress.

**IV.**        **Conclusion**

For the foregoing reasons, the court finds that there are genuine issues of material fact remaining as to Plaintiff's Title VII, PHRA, and constructive discharge claims, and therefore will deny Defendant's Motion for Partial Summary Judgement as to those claims.  However, the court will grant Defendant's motion as it applies to Plaintiff's claim for intentional infliction of emotional distress.

An appropriate order will be issued.

s/Sylvia H. Rambo
United States District Judge

Dated:  September 11, 2012.

---

(...continued)
killed a third party which led to plaintiff being indicted for homicide); *Chuy v. Phila. Eagles Football Club*, 595 F.2d 1265 (3d Cir. 1979) (defendant's team physician released to press information that plaintiff was suffering from fatal disease, when physician knew such information was false)).